IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Dayton Pugh,                          :

      Plaintiff,                     :

    v.                                 :          Case No. 2:13-cv-944

                                 :          JUDGE ALGENON L. MARBLEY
Commissioner of Social Security,          Magistrate Judge Kemp

      Defendant.                     :


REPORT AND RECOMMENDATION

I.  Introduction

    Plaintiff, Dayton Pugh, filed this action seeking review of
a decision of the Commissioner of Social Security denying his
applications for disability insurance benefits and supplemental
security income.  Those applications were filed on April 28,
2010, and alleged that Plaintiff became disabled on September 1,
2007.

    After initial administrative denials of his applications,
Plaintiff was given a videoconference hearing before an
Administrative Law Judge on April 5, 2012.  In a decision dated
June 19, 2012, the ALJ denied benefits.  That became the
Commissioner's final decision on August 12, 2013, when the
Appeals Council denied review.

    After Plaintiff filed this case, the Commissioner filed the
administrative record on December 10, 2013.  Plaintiff filed his
statement of specific errors on February 12, 2014, to which the
Commissioner responded on April 30, 2014.  No reply brief has
been filed, and the case is now ready to decide.

    II.  Plaintiff's Testimony at the Administrative Hearing

    Plaintiff, who was 45 years old at the time of the

administrative hearing and is a high school graduate, testified as follows.  His testimony appears at pages 47-77 of the administrative record.

Plaintiff was using a cane at the time of the administrative hearing, and had done so for three or four years.  He injured his back in a fall and began using the cane shortly thereafter.  It was hard for him to go up and down stairs.  He could drive but did not do so often.

In school, Plaintiff took special education classes, but he was able to read, write, and do simple arithmetic.  After graduation, he did odd jobs for a local farmer.  His last job was at a factory which made furnace filters.  He was terminated because, in his opinion, he had been pursuing a workers' compensation claim for a fall at work.  Before that, he worked at Meijer in the pet department.  That involved some shelf stocking as well as helping out on the sales floor.  He also did some jobs in the garden department.  He had been a deli worker at Kroger as well, and in 2009 he worked at a county fair for five days directing traffic and taking admission tickets.

The most significant physical problem Plaintiff had was his back.  He was in excruciating pain on a frequent basis and needed to change positions frequently.  He tried not to lift more than eight pounds, and could not sit for more than fifteen minutes at a time.  His walking was limited to about two blocks.  He was taking Tramadol and Aleve for back pain.  He also had problems with pain radiating into his left leg, pain and instability in his right knee (for which he had three surgeries), and memory difficulties, accompanied by depression.

On a daily basis, Plaintiff watched television or sat in his yard.  He did not do household chores but could bathe and dress himself with his wife's assistance.  He went shopping once a month but had no other regular activities.

-2-

III.  The Medical and Educational Records

The medical records in this case are found beginning on page 318 of the administrative record.  The pertinent records - those relating to Plaintiff's psychological, rather than his physical, conditions, since he does not make any claims of error about the latter - can be summarized as follows.  The Court will also summarize any pertinent educational records.

One school record comes from the Fairfield County Schools and consists of an evaluation team report from when Plaintiff was in the ninth grade.  At that time, his full-scale IQ was 79.  He had some problems with communication and self-direction.  An attached report indicated that Plaintiff was going to be switched from the Specific Learning Disabilities Program to the Developmentally Handicapped Program, and that some of his abilities were "slightly poorly developed."  (Tr. 318-41).

Plaintiff was assessed by Dr. Ostrander, a psychologist, on January 7, 2009, for Fairfield County Job and Family Services. He reported some depression and some memory problems.  She interviewed him for two hours, which included some testing. Plaintiff reported serving as Sunday School Superintendent and doing other jobs at his church.  He socialized with family.  He had been applying for jobs but thought he did not get them due to his lifting restrictions (six to eleven pounds).  He had never received any treatment for mental health issues.  He appeared to be functioning in the low average range of intelligence.  Test scores were either in the low average or borderline range.  Dr. Ostrander found no evidence of any major mental illness or cognitive impairment.  She concluded that Plaintiff was moderately limited in only two areas - understanding and remembering detailed instructions, and carrying them out.  (Tr. 420-30).

Several months later, Dr. Miller, also a psychologist, did a

consultative evaluation.  He described Plaintiff as a "moderate
informant" and noted that Plaintiff's affect and mood were flat.
He showed some signs of depression and anxiety.  Plaintiff
appeared to be able to follow simple directions but reported some
difficulty reading a newspaper.  His full-scale IQ was measured
at 61 and he was functioning in the mild mental retardation
range.  Dr. Miller believed that Plaintiff could understand,
remember, and carry out simple job instructions with only a mild
amount of impairment and that he would have no problems with
others in the workplace.  He did have a moderate impairment in
maintaining attention and concentration and dealing with work
stress.  His GAF was rated at 60.  Dr. Miller noted that
Plaintiff's actual functioning appeared to be somewhat higher
than his test scores showed, and that he was "possibly in the
borderline range."  His final diagnosis on that point was
borderline intellectual functioning.  (Tr. 448-52).  Dr. Miller
tested Plaintiff's memory function several months later and noted
that Plaintiff had "difficulty being able to retain, store and
retrieve information" and that his scores on the Wechsler Memory
Scale IV indicated "significant impairment."  (Tr. 453).  He then
wrote a memorandum stating that Plaintiff had a moderate
impairment in the area of following even simple instructions and
that he would be able to work in a shelter workshop environment
but perhaps not in a competitive employment situation.  He also
changed his Axis II diagnosis to mild mental retardation.  (Tr.
455-56).

In June, 2010, Dr. Miller was again asked to do an
evaluation based on a clinical interview.  At that time,
Plaintiff was reporting a moderate level of chronic anxiety with
occasional temper outbursts.  He also reported more depression,
which Dr. Miller saw as attributable to his financial situation
and medical problems.  As he did in his initial report, Dr.

Miller found only a mild impairment in the ability to follow simple instructions and in task completion.  He thought Plaintiff was also mildly impaired in his ability to interact with others. He was still moderately impaired with respect to maintaining attention and concentration and dealing with work stress.  His GAF was rated at 55.  The Axis II diagnosis in the 2010 report was borderline intellectual functioning.  (Tr. 474-77).

Dr. Meyer, a state agency psychologist, reviewed the records and reported on July 5, 2010, that Plaintiff had four moderate impairments - two relating to detailed instructions, one relating to maintaining concentration and attention for extended periods, and one in responding appropriately to changes in the work setting.  Dr. Meyer thought Plaintiff could "do simple routine tasks where he does not have to work at a fast pace or with strict productions quotas."  (Tr. 478-95).  That evaluation was confirmed by another state agency reviewer, Dr. Fernandez.  (Tr. 542).

IV.   The Vocational Testimony

Jesse Ogren, a rehabilitation counselor, was the vocational expert in this case.  His testimony begins on page 78 of the administrative record.

Mr. Ogren identified Plaintiff's factory job as an assembly job, which was unskilled and light.  The sales associate job was medium and semi-skilled, and the deli job at Kroger was unskilled and either light or medium.

Mr. Ogren was then asked some questions about a hypothetical person with a limited education who could work at the sedentary exertional level, could climb ramps and stairs occasionally but could not climb ladders or scaffolds, and could occasionally balance, stoop, kneel, crouch and crawl.  The person also needed to avoid working around hazards such as unprotected heights or dangerous machinery and had to use a cane.  Further, the person

could do only simple, routine, and repetitive tasks without fast
paced production or strict time quotas.  According to Mr. Ogren,
someone with those restrictions could not perform Plaintiff's
prior jobs, but would be able to work as a laminator, a stuffer,
or a cuff folder.  Neither those nor other jobs would be
available to someone who missed two days of work per month on a
regular basis, however.  The same would be true for someone off
task fifteen percent of the time.

V.   <u>The Administrative Law Judge's Decision</u>

The Administrative Law Judge's decision appears at pages 20-
33 of the administrative record.  The important findings in that
decision are as follows.

The Administrative Law Judge found, first, that Plaintiff
met the insured status requirements for disability benefits
through December 31, 2012.  Next, Plaintiff had not engaged in
substantial gainful activity from September 1, 2007 forward.  As
far as Plaintiff's impairments are concerned, the ALJ found that
Plaintiff had severe impairments including adjustment disorder
with anxiety and depressed mood, borderline intellectual
functioning, mild mental retardation, lumbar degenerative disc
disease with disc space narrowing and bilateral facet
hypertrophy, mild disc space narrowing at L1-2, L3-4 and L4-5,
lumbar spondylosis, lumbar spondylolisthesis, and early
degenerative right knee changes status post right knee
arthroscopy.  The ALJ also found that these impairments did not,
at any time, meet or equal the requirements of any section of the
Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix
1).

Moving to the next step of the sequential evaluation
process, the ALJ found that Plaintiff had the residual functional
capacity to perform work at the sedentary exertional level, that
he could climb ramps and stairs occasionally but could not climb

ladders or scaffolds, and that he could occasionally balance,
stoop, kneel, crouch and crawl.  He could not work around hazards
such as unprotected heights or dangerous machinery and had to use
a cane.  Further, he could do only simple, routine, and
repetitive tasks without fast paced production or strict time
quotas.  The ALJ found that, with these restrictions, Plaintiff
could perform the jobs identified by Mr. Ogren  - specifically
laminator, stuffer, and cuff folder - and that such jobs existed
in significant numbers in the regional and national economies.
Consequently, the ALJ concluded that Plaintiff was not entitled
to benefits.

### VI.   Plaintiff's Statement of Specific Errors

In his statement of specific errors, Plaintiff raises these
issues: (1) the ALJ erred by finding that Plaintiff suffered from
borderline intellectual functioning rather than mental
retardation, which affected the ALJ's conclusion about whether
Plaintiff satisfied the requirements of Listing 12.05(C); and (2)
the ALJ erred by not adopting all of the conclusions of the
consultative examiner, Dr. Miller.  The Court analyzes these
claims under the following standard.

Standard of Review.  Under the provisions of 42 U.S.C.
Section 405(g), "[t]he findings of the Secretary [now the
Commissioner] as to any fact, if supported by substantial
evidence, shall be conclusive. . . ."  Substantial evidence is
"'such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion'"  Richardson v. Perales, 402
U.S. 389, 401 (1971) (quoting Consolidated Edison Company v.
NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere
scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th
Cir. 1976).  The Commissioner's findings of fact must be based
upon the record as a whole.  Harris v. Heckler, 756 F.2d 431, 435
(6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th

Cir. 1984); <u>Fraley v. Secretary</u>, 733 F.2d 437, 439-440 (6th Cir.
1984).  In determining whether the Commissioner's decision is
supported by substantial evidence, the Court must "'take into
account whatever in the record fairly detracts from its weight.'"
<u>Beavers v. Secretary of Health, Education and Welfare</u>, 577 F.2d
383, 387 (6th Cir. 1978) (quoting <u>Universal Camera Corp. v. NLRB</u>,
340 U.S. 474, 488 (1951)); <u>Wages v. Secretary of Health and Human
Services</u>, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court
would reach contrary conclusions of fact, the Commissioner's
decision must be affirmed so long as that determination is
supported by substantial evidence.  <u>Kinsella v. Schweiker</u>, 708
F.2d 1058, 1059 (6th Cir. 1983).

### A.  <u>Listing 12.05(C)</u>

In order for a claimant to qualify for disability under
Section 12.05(C) of the Listing of Impairments, the claimant must
meet both the criteria for mental retardation and have another
impairment which significantly limits his or her ability to
perform work-related functions. Listing 12.05 sets forth certain
qualifying scores on IQ tests which must be achieved in order to
demonstrate mental retardation.  For Section (C), it is a valid
verbal, performance, or full-scale IQ score between 60 and 70.
However, such a score is not sufficient to prove the existence of
mental retardation.  According to the preamble to the Listing,
the claimant must also demonstrate deficits in adaptive
functioning which manifested themselves prior to age 22.  If that
evidence is absent, the Listing has not been satisfied.  <u>See</u>
<u>Brown v. Secretary of H.H.S.</u>, 948 F.2d 268 (6th Cir. 1991).

The ALJ discussed whether Plaintiff met this Listing.  In
concluding that he did not, the ALJ determined that Plaintiff did
not have deficits in adaptive functioning which manifested
themselves prior to age 22.  To support that finding, he noted
that Plaintiff had significantly higher IQ scores when tested in

1983; that Plaintiff was able to graduate from high school and
begin work right away; and that Plaintiff has performed not just
unskilled work but semi-skilled work as well.  (Tr. 25-26).
Plaintiff claims this was error because an earlier non-qualifying
IQ score, or the absence of a qualifying score before age 22, is
not determinative of the issue of deficits in adaptive
functioning.  He also asserts that his 1983 IEP constitutes
"substantial evidence that demonstrates multiple functional
academic deficiencies that can be used to infer that the
plaintiff suffered from deficits in adaptive functioning before
the age of 22."  Statement of Errors, Doc. 15, at 5.

     This latter statement, even if it is an accurate reading of
the IEP, does not provide a proper basis for reversing the ALJ's
decision.  The presence of substantial evidence to support the
opposite conclusion says nothing about whether the record would
permit either conclusion to be drawn, and has consistently been
rejected as a basis for overturning an ALJ's decision.  See,
e.g., Kalmbach v. Comm'r of Social Security, 409 Fed. Appx. 852,
859 (6th Cir. Jan.7, 2011) ("If substantial evidence supports the
ALJ's conclusion and the ALJ applied the correct legal standards,
we are not at liberty to reverse the ALJ's decision even if
substantial evidence exists in the record that would have
supported an opposite conclusion").  The same is true regarding
the earlier IQ score.  While it may not, standing alone, be
determinative of the presence or absence of deficits in adaptive
functioning, see, e.g. Oyer v. Comm'r of Social Security, 2014 WL
1796404 (S.D. Ohio May 6, 2014), adopted and affirmed 2014 WL
2211030 (S.D. Ohio May 28, 2014), there is no prohibition against
considering such scores, along with other relevant evidence, in
deciding if a claimant has met his burden of showing the
requisite deficits in adaptive functioning.

     Further, the IEP in question primarily addresses Plaintiff's
academic progress at age 16.  Adaptive functioning is much

-9-

broader, however.  "'Adaptive functioning' includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills."  West v. Comm'r of Soc. Security, 240 Fed. Appx. 692, 698 (6th Cir. 2007), citing Heller v. Doe by Doe, 509 U.S. 312, 329 (1993).  The IEP does not address most of these factors except for some deficits in communication, and characterizes Plaintiff's development as "slightly poor[]."

Here, Plaintiff's ability to complete school, to receive good grades (as he told the consultative examiner), to work immediately after graduation, to work at a number of different jobs, to perform semi-skilled work, to marry, to raise children, and to live independently, all support a finding that he did not have deficits in adaptive functioning at any time in his life. See, e.g., Robinson v. Comm'r of Social Security, 2014 WL 3419309, *9 (S.D. Ohio July 10, 2014), adopted and affirmed 2014 WL 4748483 (S.D. Ohio Sept. 23, 2014)("the ALJ did not err in considering Plaintiff's work, marriage, and family history, among other indicators of her functioning, in evaluating her adaptive functioning"), citing Justice v. Comm'r of Social Security, 515 Fed. Appx. 583, 587 (Nth Cir. Feb. 22, 2013).  Consequently, substantial evidence supports the ALJ's determination that Plaintiff's condition did not meet or equal the impairment described in Listing Section 12.05(C).

### B.  Dr. Miller's Opinion

Plaintiff's other basis for urging the Court to overturn the ALJ's decision is the way that the ALJ evaluated Dr. Miller's opinion.  As noted above, Dr. Miller conducted two separate consultative examinations of Plaintiff and wrote three reports describing his conclusions about Plaintiff's mental impairments and the limitations they posed with respect to work-related activity.  The ALJ gave "significant weight" to Dr. Miller's assessment, Tr. 30, because it was consistent with the ALJ's determination that Plaintiff had moderate limitations in the

areas of maintaining concentration, persistence, and pace, and in handling work stress, and because the objective evidence of record supported these findings.  However, the ALJ implicitly rejected some of Dr. Miller's findings, giving "great weight" to Dr. Meyer's opinion that Plaintiff could perform simple tasks in a low-stress work environment.  (Tr. 31).  Plaintiff argues that the ALJ should not have rejected Dr. Miller's statements that Plaintiff was functioning in the mild mental retardation range of intellect, had extremely low memory function, was moderately impaired in his ability to carry out simple job instructions, would have difficulty in a competitive environment, and had been fired for being too slow.

As the Commissioner points out, however, Dr. Miller did not diagnose Plaintiff with mild mental retardation but borderline intellectual functioning.  The ALJ had a substantial basis for making the same finding.  Further, in two of his three reports, Dr. Miller did not impose moderate restrictions on the ability to carry out simple instructions and tasks, but a mild impairment. Additionally, Plaintiff did not testify to having been fired for working too slow; his last job ended in a dispute about workers' compensation benefits.  Finally, to the extent that Dr. Miller and Dr. Meyer held conflicting views, the ALJ was entitled to credit Dr. Meyer's opinion, especially in light of the existence of other evidence (such as Dr. Ostrander's evaluation) showing that Dr. Miller's view of Plaintiff's memory problems was not supported by the evidence.

Basically, Plaintiff is faulting the ALJ for not accepting Dr. Miller's opinions in their entirety.  But when faced with conflicting evidence, it is up to the ALJ to choose which medical opinion to credit.  Clearly, "[an] ALJ [i]s not required to uncritically accept the conclusions of [a] onetime examiner," Tate v. Comm'r of Social Security, 2014 WL 4536929, *19 (E.D. Mich. Sept. 11, 2014).  Rather, "[i]t is up to the ALJ to choose

among competing medical opinions, and so long as the ones he
chooses are supported by substantial evidence in the record, the
Court cannot disturb that choice." Blankenship v. Comm'r of
Social Security, 2014 WL 3734362, *9 (S.D. Ohio July 29, 2014).
That is the case here.  The somewhat extreme limitations found by
Dr. Miller were discounted by two state agency reviewers, and the
ALJ had valid reasons for choosing to give more weight to their
opinions.  Consequently, this claim provides no basis for
reversal or remand.

## VII.   Recommended Decision

Based on the above discussion, it is recommended that the
Plaintiff's statement of errors be overruled and that judgment be
entered in this case in favor of the Defendant Commissioner of
Social Security.

## VIII.   Procedure on Objections

If any party objects to this Report and Recommendation,
that party may, within fourteen (14) days of the date of this
Report, file and serve on all parties written objections to those
specific proposed findings or recommendations to which objection
is made, together with supporting authority for the objection(s).
A judge of this Court shall make a de novo determination of those
portions  of the report or specified proposed findings or
recommendations to which objection is made.  Upon proper
objections, a judge of this Court may accept, reject, or modify,
in whole or in part, the findings or recommendations made herein,
may receive further evidence or may recommit this matter to the
magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to
object to the Report and Recommendation will result in a
waiver of the right to have the district judge review the
Report and Recommendation de novo, and also operates as a
waiver of the right to appeal the decision of the District
Court adopting the Report and Recommendation.  See Thomas v.

<u>Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d
947 (6th Cir. 1981).


/s/ Terence P. Kemp
United States Magistrate Judge
